DOUGLAS F. GANSLER
ATTORNEY GENERAL

KATHERINE WINFREE
Chief Deputy Attorney General

JOHN B. HOWARD, JR.
Deputy Attorney General

DAN FRIEDMAN
Counsel to the General Assembly

SANDRA BENSON BRANTLEY
BONNIE A. KIRKLAND
KATHRYN M. ROWE
Assistant Attorneys General



# THE ATTORNEY GENERAL OF MARYLAND
## OFFICE OF COUNSEL TO THE GENERAL ASSEMBLY

July 18, 2008

The Honorable Samuel I. "Sandy" Rosenberg
4811 Liberty Heights Avenue
Baltimore, MD 21207

Dear Delegate Rosenberg:

You have asked for advice concerning the effect of the decision of the Supreme Court in *District of Columbia v. Heller*, 554 U.S. __ (June 26, 2008) on laws in Maryland. As you are aware, it has generally been understood that the Second Amendment does not apply to or limit the action of state governments. *United States v. Cruikshank*, 92 U.S. 542 (1875); *Scherr v. Handgun Permit Review Board*, 163 Md.App. 417 (2005); 79 *Opinions of the Attorney General* 206 (1994); Antonin Scalia, *A Matter of Interpretation* pp. 136-137 n.13 (1997) ("Of course, properly understood, [the Second Amendment] is no limitation upon arms control by the states."). For purposes of this letter, however, because this area of the law is in considerable flux, I proceed as if the Second Amendment does apply to the states.[1] Even with this predicate, it is my view that the decision does not affect the laws currently in place in Maryland.

---

[1] The Supreme Court uses a process called "selective incorporation" to determine whether specific provisions of the bill of rights are to be applied to the states as well as to the federal government. The test is whether a right "is among those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,' whether it is 'basic in our system of jurisprudence,' and whether it is a 'fundamental right, essential to a fair trial.'" *Duncan v. Louisiana,* 391 U.S. 145, 148-149 (1968) (citations omitted). In *Heller*, the Supreme Court explicitly noted that the "continuing validity" of the holding in *Cruikshank* that the Second Amendment has not been interpreted is "a question not presented by this case." *Slip op.* at 48, n.23.

*THE HELLER CASE*

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment conferred an individual right to keep and bear arms. *Slip op.* at 22. The Court did not determine a standard applicable to the analysis of legislation affecting the ownership of firearms, but concluded that, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," a complete ban of handguns from the home would be unconstitutional. *Slip op.* at 56-57. As a result, it held that a law completely prohibiting the ownership and use of handguns was invalid. *Slip op.* at 58. In addition, it held that a law requiring that any firearm be rendered and kept inoperable at all times would be invalid. *Id.* The Court concluded that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Slip op.* at 64.

In reaching the conclusion that the Second Amendment protected an individual right to own and use guns, the Court noted that:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Slip op.* at 54. The Court further noted that this list of presumptively lawful regulatory measures was not exhaustive. *Slip op.* at 55, n. 26.

*MARYLAND'S GUN LAWS*

Below is a discussion of provisions of Maryland law that could arguably be affected by the *Heller* decision. I discuss them in the order in which they appear in the Annotated Code, with some regrouping for similar provisions.

### Pawnbrokers

Business Regulation Article § 12-301(b)(3)(iii) requires pawnbrokers to make written records of business transactions involving firearms. This provision places no realistic limitation on the ability of any person to purchase, possess or use a firearm. Moreover, it would appear to fall within the class of permissible regulations that the Court described as "laws imposing conditions and qualifications on the commercial sale of arms." *Slip op.* at 54. Thus, this provision would not be affected by the decision in *Heller*.

### Innkeepers

Business Regulation Article § 15-203(a) provides a list of situations in which an innkeeper may refuse to provide lodging or services to an individual or remove an individual from a lodging establishment, including the ability to refuse service to an individual who the innkeeper reasonably believes possesses property that may be dangerous to other individuals, such as firearms or explosives. This section was adopted by Chapter 307 of 2002 to clarify the rights and duties of innkeepers in light of the common law duty to provide lodging to "every one who offers himself as a guest, if there be sufficient room for him in the inn, and no good reason for refusing him." *Curtis v. Loether*, 415 U.S. 189, 195-196, n.10 (1974). As there is no suggestion in the *Heller* case or elsewhere that the Second Amendment protects the right to carry a firearm on the private property of another, it is my view that this provision would not be affected by the decision in *Heller*. Moreover, this provision is certainly a reasonable one in light of the heightened duty of innkeepers for the safety of their guests. *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md.App. 207, 220-221 (2005); *O'Reilly v. Murdoch*, 1 Gill 32, 1843 WL 3012 (1843).

### Concealed Weapons

Criminal Law Article § 4-101 makes it illegal to carry a concealed dangerous weapon, which is defined to include firearms, but not handguns. The *Heller* decision expressly notes that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Slip op.* at 54. Thus, it is my view that this law would not be affected by the decision in *Heller*.

*Schools*

Criminal Law Article § 4-102 prohibits the carrying or possession of deadly weapons, including handguns and other firearms, on school property. The opinion in *Heller* expressly states that the decision should not be taken "to cast doubt on ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Slip op.* at 54. Therefore, this provision would not be affected by the decision in *Heller*. The same is true of Education Article § 7-305, which provides that a student may be expelled for bringing a firearm onto school property, and Education Article § 4-319(d)(1), which provides that a student in the Baltimore City School System may be transferred to the Alternative Learning Center if the student carries a gun, rifle, knife, or other deadly weapon onto school property.

*Children*

Criminal Law Article § 4-104(c) provides that a person "may not store or leave a loaded firearm in a location where the person knew or should have known that an unsupervised child would gain access to the firearm." The term "child" refers to a person under the age of 16. A provision of the District of Columbia law found invalid in *Heller* required that firearms be kept "unloaded and dissembled or bound by a trigger lock or similar device." Section 4-104 applies only to loaded firearms and does not require any specific action, but rather what is reasonable in the circumstances of each case. Moreover, it is reasonably possible to keep a loaded weapon in a way that is accessible to the adult members of the family, but not to a child under the age of 16. Therefore, it is my view that this provision is not affected by the decision in *Heller*.

*Wear and Carry*

Criminal Law Article § 4-203 provides that a person may not wear, carry, or transport a handgun, whether concealed or open, on or about the person, or wear, carry or transport a handgun, whether concealed or open, in a vehicle on a road or parking lot generally used by the public, or a highway, waterway or airway of this State. *See also* Public Safety Article § 5-303 ("A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun."). The section makes exceptions for those who have been issued a permit to wear, carry or transport a handgun, those who wear, carry or transport a handgun for their duties, and those traveling between points where legal possession, sale or use of handguns take place. Criminal Law Article § 4-203(b). Moreover, it does not apply to the possession of a handgun in the home, which was the issue addressed in *Heller*. The decision in *Heller* did not address the validity of the licensure provision for firearms other than handguns in the District of Columbia, but instead held that Heller must be issued a

license to carry a handgun in his home. *Slip op.* at 59. Thus, nothing in the *Heller* decision would bring the validity of the permit requirement into question.

### Commission of Crimes

A variety of statutes throughout the Criminal Law Article prohibit the use of firearms and handguns in the commission of various crimes, or provide for a harsher sentence if firearms or handguns are used. *See e.g.,* Criminal Law Article §§ 3-202, 4-204, 5-621. The *Heller* decision makes clear that the Second Amendment does not protect the rights of citizens to carry arms for "*any sort* of confrontation." *Slip op.* at 22. It seems clear that it should not be read to protect the right to carry arms in the commission of a crime. Therefore, these provisions would not be affected by the decision in *Heller*.

### Wear and Carry While Under the Influence

Criminal Law Article § 4-207 provides that a person who holds a permit to wear, carry, or transport a handgun cannot do so when under the influence of alcohol or narcotics. *See also* Public Safety Article § 5-314. Similarly, Natural Resources Article, § 10-410 provides that a person may not carry a firearm to hunt any wild bird, mammal, amphibian, or reptile while intoxicated or under the influence of alcohol or any narcotic drug. It is my view that these provisions are similar to those which prohibit the possession or use of firearms by other persons who are under a disability, such as children and the insane. While the influence of alcohol or drugs is more fleeting than either of these conditions, the danger to the public is as great or greater. Thus, it is my view that these limitations fall in the class of those that would not be affected by the decision in *Heller*.

### Public Demonstrations

Criminal Law Article § 4-208 prohibits possession of a firearm at a demonstration in a public place after the person has been informed by a law enforcement officer that a demonstration is occurring in the public place, and the person has been ordered by the law enforcement officer to leave the area of the demonstration until they have disposed of the firearm. The term "demonstration" is defined to mean "one or more persons demonstrating, picketing, speechmaking, marching, hold a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers." The *Heller* decision makes clear that the opinion does not prohibit the State from passing laws forbidding the carrying of firearms in "sensitive places." *Slip op.* at 54. While public demonstrations are not one of the examples given, it is clear that a place where people gather to express views or grievances

is one where the State has an enhanced interest in preventing the outbreak of violence. Moreover, the effect of the prohibition is significantly limited by the fact that it is violated only if the person remains in the public place with a firearm after being told by a law enforcement officer that a demonstration is taking place and that the firearm must be taken off the premises. Therefore, it is my view that this provision also is not affected by the decision in *Heller*.

### Dangerous and Unusual Weapons

Criminal Law Article, Title 4, Subtitle 4 places significant restrictions on the possession and use of machine guns and requires registration of those machine guns that are legally possessed. Criminal Law Article § 4-303 prohibits transport into the State, possession, sale, offers to sell, transfers and purchases of assault pistols. Criminal Law Article § 4-305 prohibits the manufacture, sale, offer for sale, purchase, receipt or transfer of a detachable magazine with capacity of more than 20 rounds of ammunition for a firearm. Public Safety Article § 5-203 prohibits possession of a short barreled rifle or shotgun.

In its discussion of *United States v. Miller*, 307 U.S. 174 (1937), the *Heller* court rejected the argument that *Miller* held that the Second Amendment protected only the right to keep and bear arms for certain military purposes, *slip op.* at 49, holding instead that *Miller* held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Slip op.* at 53. The Court further explained that *Miller* said that the weapons protected were those "in common use at the time," and thus not "dangerous and unusual weapons." *Slip op.* at 55. Because *Miller*, which was not overruled by the Court, upheld a ban on machine guns, and the Court expressly mentioned short-barreled shotguns in its explanation of the limitations of the Second Amendment, it is clear that sections limiting or prohibiting the ownership and use of these weapons are not affected by the decision in *Heller*. It is my understanding that the prohibited assault pistols and the detachable magazines share qualities that make machine guns and similar weapons "unusual and dangerous," including the ability to fire many rounds in a short period of time. Thus, it is unlikely they fall within the class of weapons "typically possessed by law-abiding citizens for lawful purposes." For this reason, it is my view that none of the above-mentioned sections would be affected by the decision in *Heller*.

*Felons*

Criminal Law Article § 5-622(b) provides that a person may not possess, own, carry, or transport a firearm if that person has been convicted of a felony. This provision clearly comes within the statement in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and would not be affected by the decision in that case.

*Domestic Violence*

Family Law Article § 4-506(d)(12) provides that a final protective order may order the respondent to surrender to law enforcement authorities any firearm in the respondent's possession for the duration of the protective order.[2] In addition, Public Safety Article § 5-133(b)(9) bars the possession of a regulated firearm by a person who "is a respondent against whom a current non ex parte civil protective order has been entered under § 4-506 of the Family Law Article." The term "regulated firearm" is defined to include handguns and a list of specific assault weapons.

In *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), Emerson challenged 18 U.S.C. § 922(g)(8)(C), which prohibits possession of a firearm by a person who is subject to a court order that was issued after a hearing of which the person had notice, and in which the person had an opportunity to participate, that "restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child," and that includes a finding that such person presents a credible threat to the physical safety of the intimate partner or child, or by its terms expressly prohibits the use of physical force against the intimate partner or child that would reasonably be expected to cause bodily injury. The court found that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms." *Id.* at 260. However, it upheld 18 U.S.C. § 922(g)(8)(C), and found that Texas law met the standards in that provision, allowing it to be used as the basis for action under 18 U.S.C. § 922(g)(8)(C).

---

[2] Chapter 397 of 2008, effective October 1, 2008, adds a new provision § 4-506(h) permitting the entry of a permanent protective order against a respondent who was convicted of and served at least five years for one or more of a list of offenses as a result of the abuse leading to the final protective order.

Family Law Article § 4-506(a) requires that the respondent have an opportunity to be heard on the question of whether the judge should issue a final protective order under the section, and makes provision for notice of the hearing. Moreover, unless the respondent agrees to the entry of a protective order, it must be based on a finding, by clear and convincing evidence, that the abuse occurred, and the protective orders may, and virtually always do, expressly prohibit the use of physical force against the protected persons. For the reasons stated in *Emerson*, it is my view that the decision in *Heller* would not affect the validity of Family Law Article § 4-506(d)(12) or Public Safety Article § 5-133(b)(9).

Family Law § 4-511 provides that a law enforcement officer responding to the scene of an alleged act of domestic violence may remove a firearm the law enforcement officer observes on the scene during the response if the law enforcement officer has probable cause to believe that an act of violence has occurred. The law enforcement officer must give the owner of the firearm information on how to get it back, and provide for the safe storage of the firearm during the pendency of any proceeding related to the alleged act of domestic violence. The owner of the firearm is permitted to reclaim it at the conclusion of such a proceeding unless ordered to surrender the firearm under § 4-506.

The *Heller* decision does not address situations involving domestic violence. Nevertheless, the Court notes that "we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Slip op.* at 22. Thus, it is my view that *Heller* should be interpreted to invalidate a law that permits a law enforcement officer with probable cause to believe that an offense has occurred to remove a weapon from a volatile domestic situation.

## Oyster Dredgers

Natural Resources Article § 4-1013(g) provides that the captain, master or any person on board or having control of any dredge boat, may not have or permit to be kept on the dredge boat more than two shotguns not larger than a number ten gauge and using shot not larger than number one. For at least two reasons, this provision cannot be fully understood without reference to its history. First, the history shows that, at the time it was enacted, this was an important and necessary provision. Second, it appears from the history that the 1973 codification of the provision into the Natural Resources Article did not capture its provisions correctly.

The restriction on arms on vessels engaged in oyster dredging dates from a time when there was significant resistance to the enforcement of the laws regarding oysters. The initial requirement of a license for vessels involved in the oyster trade was adopted in 1865. Chapter 181 of 1865. In 1867 a substitute law was adopted, adding a number of provisions, including one making it a misdemeanor to resist an officer enforcing the law. Chapter 184 of 1867. Similar provisions appeared in revisions in Chapter 406 of 1868,[3] Chapter 364 of 1870, Chapter 181 of 1874,[4] and Chapter 198 of 1880. In 1884, the General Assembly concluded that resistance had become such a problem that they declared it a felony. Chapter 518 of 1884.[5] This language was retained in Chapter 296 of 1886. In 1888, however, the section was amended to include the provisions that eventually became § 4-1013(g). Specifically, Chapter 433 of 1888 added introductory language to the original section providing that:

> It shall not be lawful for the owner or master, or any person on board of, or having control over any boat or vessel licensed to catch or take oysters in the waters of this state with scoop, dredge or any similar instrument, to have or permit to be kept on such boat or vessel any cannon, howitzer or any other piece of ordinance, or any swivel, musket, rifle or other piece or species of firearms larger than a pistol, except two shotguns not larger than a number ten gauge, and not to use larger than number one shot.

This provision was retained in subsequent revisions of the law. *See* Chapter 380 of 1894 and Chapter 929 of 1945. Thus, when the time came for the Natural Resources Article Code Revision, the provision read as follows:

---

[3] Chapter 406 also made all owners and masters of licensed vessels, "being white men," officers of the state for the purpose of arresting those who violated provisions of the article.

[4] Chapter 181 also authorized the purchase of one cannon for each of the guard boats assigned to the enforcement of the oyster laws, along with "such other arms and ammunition as may be necessary to make them efficient."

[5] Chapter 518 also authorized the Board of Public Works to purchase for each of the guard boats such arms and ammunition as may be necessary to make them efficient, and authorized the officers of the boats to "use such arms in their discretion for the enforcement of the provisions of this act."

It shall be unlawful for the captain or master, or any person on board of, or having control of any dredge boat, to have or permit to have or permit to be had or kept on such boat any cannon, howitzer or any piece of ordinance or any swivel, musket, rifle or other species larger than a pistol, except two-shot guns not larger than a number ten gauge and using shot not larger than number one. No person shall discharge any species of firearm at or toward any officer authorized under this subtitle to make arrests while such officer is engaged in discharging his duties hereunder, or at or toward any boat upon which such officer shall be while engaging in his duties hereunder.

Article 66C, § 702(m) (1957 Code, 1970 Replacement Volume).

Post code revision, the section is significantly different. The provision, unchanged from the time of the 1973 recodification, reads:

Subject to the laws relating to firearms, the captain, master or any person on board or having control of any dredge boat, may not have or permit to be kept on the dredge boat more than two shotguns not larger than a number ten gauge and using shot not larger than number one.

Natural Resources Article § 4-1013(g) (1974 Volume). In short, the revised version completely drops the language in the original that limited its application to firearms larger than a pistol. The Revisor's Note does not adequately explain this exclusion. It states:

Subsection (g) presently appears as Article 66C, § 702(m) of the Code. A clause is added at the beginning of this section subjecting its provisions to other laws relating to firearms to place the Code user on notice of the existence of other laws and dispel any thought this section grants any right contrary to other laws. The present references to ancient firearms are proposed for deletion despite their historical significance of weaponry of the oyster wars.[6] The last sentence is proposed for deletion because it duplicates other criminal statutes prohibiting persons from firing at law enforcement officers.

From this explanation, it appears that the limitation of the prohibition to weapons larger than a pistol was inadvertently deleted along with the "present references to ancient firearms." It is well-established, however, that "a change in a statute as part of a general recodification

---

[6] For information on the Oyster wars, *see* http://www.bayjournal.com/article.cfm?article=835

will ordinarily not be deemed to modify the law unless the change is such that the intention of the Legislature to modify the law is unmistakable." *Pack Shack v. Howard County*, 371 Md. 243, 257 (2002). Thus, Natural Resources Article § 4-1013(g) should not be read to prevent anyone from having a firearm of pistol size or smaller if that possession is consistent with the other laws governing firearms. Even if it did so, however, it would not be affected by the *Heller* decision, which does not extend beyond the right to carry firearms in the home.

### Dealers' Licenses

Public Safety Article § 5-106 requires a person to have a dealers license to engage in the business of selling, renting or transferring regulated firearms. This requirement clearly falls within the statement in the *Heller* decision that "nothing in our opinion should be taken to cast doubt on ... laws imposing conditions and qualifications on the commercial sale of arms." *Slip op.* at 54. The same is true of Public Safety Article § 5-117 (requiring that a person submit an application before the purchase, rental or transfer of a regulated firearm); § 5-123 (requiring a seven-day waiting period for the purchase of a regulated firearm); and § 5-128 (b)(providing that a person may not purchase more than one regulated firearm in a 30-day period).

### Shell Casings

Public Safety Article § 5-131 requires a manufacturer that sends a handgun into this State for sale, rental or transfer to include a shell casing of a projectile discharged from the handgun and any additional information required by the Secretary to identify the type of handgun and shell casing. The dealer is to confirm compliance by the manufacturer to the Department of State Police, and, on sale, rental or transfer of the handgun, forward the sealed container with the shell casing to the Department of State Police Crime Laboratory. It is my view that this requirement also falls within the class of those "imposing conditions and qualifications on the commercial sale of arms." In addition, it is my understanding that the requirement does not act to significantly reduce the handguns available for sale in the State.

### Safety Locks

Public Safety Article § 5-132 states that a dealer may not sell, offer for sale, rent or transfer a handgun manufactured on or before December 31, 2002 without an external safety lock, and may not sell, offer for sale, rent or transfer a handgun manufactured on or after January 1, 2003 unless it has an integrated mechanical safety device. This provision does not require that the owner of a handgun keep the safety device locked at any time, but merely requires that handguns that are sold have the feature available so that those who so desire

may lock them. Thus, it is not affected by the holding in *Heller* that DC Code § 7-2507.02, which requires that any firearm be kept unloaded or disassembled or bound by a trigger lock or similar device, was invalid. *Slip op.* at 58. Moreover, it is my understanding that the approval of after market integrated mechanical safety devices has resulted in the availability of most legal handguns in the State.[7]

*Restrictions on Possession of Regulated Firearms*

Public Safety Article § 5-133 prohibits possession of a regulated firearm by those who have been convicted of a disqualifying crime or convicted of a common law crime and sentenced to more than two years, as well as those who are a fugitive from justice, a habitual drunkard, addicted to or a habitual user of controlled dangerous substance, or suffering from a mental disorder, and those who have been confined for more than 30 days for mental disorder, have non ex parte protective order against them under Family Law Article § 4-506 or who, if under 30 were adjudicated delinquent for what would be a qualified offense.

As discussed above, the *Heller* court expressly stated that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." With the exception of the protective order provision, which is discussed above, each of these limitations fits within that description. This includes the application to adjudications of delinquency, because the extension of disabilities attendant on adult crimes to adjudications of delinquency is generally upheld for the same reasons as the application to the adult crimes is upheld. *See State v. Menuto,* 912 So.2d 603 (Fla.App. 2005) (Upholding prohibition on possession of a firearm by a person under the age of 24 who was found to have committed a delinquent act that would be a felony if committed by a an adult) *see also In re Richard A.,* 946 A.2d 204 (R.I. 2008) (sex offender registration requirements); *In re D.L.,* 160 S.W.3d 155 (Tex.App.2005) (same); *In re Jeremy P.,* 692 N.W.2d 311 (Wis.App. 2004) (same); *In re Ronnie A.,* 585 S.E.2d 311 (S.C. 2003) (same); *In re D.R.,* 794 N.E.2d 888 (Ill.App. 2003) (same); *People ex rel. C.B.B.,* 75 P.3d 1148 (Colo.App. 2003) (same); *In re Welfare of J.R.Z.,* 648 N.W.2d 241 (Minn.App. 2002) (same).

---

[7] *See* http://www.mdsp.org/downloads/Safety_devices.pdf

### Possession by the Mentally Disabled

Public Safety Article § 5-205 bars possession of a rifle or shotgun by a person with a mental disorder. This provision also falls with the statement in *Heller* that it does not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Slip op.* at 54.

### Permit Requirements

Public Safety Article § 5-306 sets out the requirements for the issuance of a permit to wear, carry or transport a handgun. For the most part, the requirements are similar to those for possession of a regulated firearm under § 5-133. There are, however, two additional requirements. Section 5-306(a)(5)(i) requires that, based on investigation, the person "has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." Section 5-306(a)(5)(ii) requires that, based on investigation, the person "has a good and substantial reason to wear, carry or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." The latter provision has been interpreted to require that the applicant face a level of danger higher than that the average person would expect to encounter. *See e.g., Scherr v. Handgun Permit Review Board*, 163 Md.App. 417, 427, 437-438 (2005).

It is my view that the decision in *Heller* would have no bearing on the denial of a permit to a person who, after an individualized investigation, is determined to pose a danger to themselves or others if they possess a handgun. Moreover, because the *Heller* decision does not reach beyond the right to carry handguns in the home, for which a permit is not required, it would not affect the "good and substantial reason" requirement as it has been applied to date.[8]

---

[8] Speculation as to whether this provision would survive Second Amendment scrutiny would be premature. While the *Heller* decision contains some language indicating that the Second Amendment would "guarantee the individual right to possess and carry weapons in case of confrontation," *slip op.* at 19, cases cited at 42-43, 57, the court also recognized that "the need for defense of self, family and property is most acute" in the home, *slip op.* at 56. The Court has not established a standard to be applied in the analysis of any limitation on gun ownership, much less considered whether a higher standard might apply to limitations affecting possession in the home, as opposed to possession in public places.

*Handgun Roster*

Public Safety Article § 5-406 provides that a person may not manufacture for distribution or sale a handgun that is not included on the handgun roster in the State. In addition, a person may not sell of offer for sale in the State a handgun manufactured after January 1, 1985 that is not on the handgun roster or manufacture, sell, or offer for sale a handgun on which the manufacturer's identification mark is obliterated, removed, changed or otherwise altered. The criteria for inclusion on the handgun roster relate to concealability, ballistic accuracy, weight, quality of materials, quality of manufacture, reliability as to safety, caliber, detectability by standard security devices, and the utility for legitimate sporting activities, self-protection, or law enforcement. While some of these criteria relate to law enforcement concerns, many of them are aimed at basic consumer protection issues, such as whether the gun is safe, reliable, and useful for the purposes for which it might be purchased, including self-defense. Moreover, it is my understanding that the handgun roster does not place significant limitations on the ability of Maryland residents to purchase handguns to meet their lawful needs. For this reason, it is my view that the requirement imposes legitimate "conditions and qualifications on the commercial sale of arms," *slip op.* at 54, and would not be affected by the decision in the *Heller* case.

*Assault Weapons in Legislative Buildings*

State Government Article § 2-1702 provides that a person may not willfully bring an assault weapon or other firearm or destructive device into or have an assault weapon or other firearm or destructive device in a building where: (i) the Senate or the House has a chamber; (ii) a member, officer, or employee of the General Assembly has an official office; or (iii) a committee of the General Assembly, the Senate, or the House has an office. The opinion in *Heller* expressly states that it should not be taken "to cast doubt on ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Slip op.* at 54. Thus, this provision would not be affected by the decision in *Heller*.

*Aircraft*

Transportation Article § 5-1008 provides that a person may not be aboard, board, or attempt to board any aircraft engaged in certificated air commerce services with any firearm or explosive on or about his person, whether openly or concealed. It is my view that aircraft, though not expressly mentioned in *Heller*, are "sensitive places" where the government may legitimately forbid the carrying of firearms. Thus, this provision would not be affected by the decision in *Heller*.

## Local Regulation

Article 23A, § 2(b)(10) grants municipalities the authority "[t]o control the use and handling of dangerous and explosive materials, and to prevent the firing of any firearms or other." This provision does not authorize municipalities to limit possession of firearms, only to regulate where they may be discharged. The Supreme Court noted in *Heller* that this type of limitation was unlikely to be applied against a person who fired in self-defense. *Slip op.* 60-61. Thus, this authorization would not be affected by the decision in *Heller*.

## Conclusion

I believe that I have identified all of the provisions of Maryland relating to firearms that could conceivably be affected by the *Heller* decision. If you are aware of any others I would be happy to look at them. With respect to those I have identified, I am confident that they are not rendered invalid by the decision in *Heller*.

Sincerely,

Kathryn M. Rowe /D7.

Kathryn M. Rowe
Assistant Attorney General

KMR/kmr
rosenberg     07 18 08.wpd